# ROBERT K. JACKSON, JR. *v.* STATE OF MARYLAND

[No. 657, September Term, 1970.]

*Decided August 5, 1971.*

The cause was argued before ANDERSON, ORTH and POWERS, JJ.

*Edward J. Angeletti* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Stephen Miles, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

### THE MOTION FOR DISMISSAL OF THE IN- DICTMENTS
### THE PRELIMINARY HEARING AND ASSISTANCE OF COUNSEL

The initial question presented by Robert K. Jackson, Jr. on appeal from the judgment entered upon his conviction by a jury in the Criminal Court of Baltimore of the robbery with a deadly weapon of Henry Woodby on 1 February 1970 involves his right to assistance of counsel at the preliminary hearing on the charge. At the time

the hearing was conducted [1] the law of this State was that an indigent accused did not have a constitutional right to have counsel appointed to represent him at a preliminary hearing because it was not ordinarily a critical stage of the judicial process. *Mercer v. State*, 237 Md. 479; *Coleman v. State*, 8 Md. App. 65.[2] However, on 22 June 1970, in *Coleman v. State of Alabama*, 399 U. S. 1, a majority of the Supreme Court made clear that the assistance of counsel at a preliminary hearing as conducted in Maryland was constitutionally mandated.[3] It left unanswered the question of the application of the rule it enunciated, but we held in *Billings v. State*, 10 Md. App. 31 that it applied only to cases in which the preliminary hearing was held on or after 22 June 1970.

The indictment here came on for trial on 29 July 1970.[4] The jury were empaneled and sworn. Out of their presence defense counsel said he had a motion to make. He told the court that he had been privately retained by Jackson and that when Jackson was taken before the Municipal Court for the preliminary hearing he requested the presence of his counsel. The judge "told him that he did not need counsel at the preliminary hearing, that it was not a critical stage of the proceedings and proceeded with the preliminary hearing over his objections and without notifying counsel and giving counsel the opportunity of being present. On the basis of the denial of the

---

1. The exact date does not appear in the record. However Jackson was committed to the Baltimore City Jail to be held for further action by order of 5 February 1970 of the Municipal Court of Baltimore, Criminal Division. He was presented by the Grand Jury on 27 February and the indictment was filed 18 March.

2. But we followed the dictates of *White v. Maryland*, 373 U. S. 59, so that disclosures of an uncounseled person at a preliminary hearing were to be excluded if he was later tried. *Butina v. State*, 4 Md. App. 312.

3. The opinion of the Court, delivered by Mr. Justice Brennan, stated that if an accused does not have the assistance of counsel at a preliminary hearing and has not effectively waived the right, the test to be applied is whether the denial of counsel was harmless error under *Chapman v. State of California*, 386 U. S. 18.

4. Jackson went to trial on indictments 942, 943, 944 and 945, each charging armed robbery. He was convicted under 945. Judgment of acquittal was granted as to 942. The jury returned verdicts of not guilty as to 943 and 944.

right to counsel at that time the defendant was confronted with the witnesses who are against him in this case (sic). They are witnesses who identify him as being the perpetrator of the offenses named in these indictments, and it is my contention, and his contention at this time that prejudice has resulted to him as the result of the failure of the Municipal Court to permit him to have counsel." [5] Counsel moved to dismiss the indictments. He offered to present testimony on the motion. The court denied the motion on the basis that under the authority of *Billings v. State, supra, Coleman v. Alabama, supra,* was not applicable.

The enjoyment of the right to have "the Assistance of Counsel for his defence" in all criminal prosecutions was bestowed on an accused by Amendment VI to the Constitution of the United States. Article 21 of the Declaration of Rights of the Constitution of Maryland provides that in all criminal prosecutions, "every man hath a right * * * to be allowed counsel." Even before *Gideon v. Wainwright,* 372 U. S. 335 (1963) held that the sixth amendment right to counsel flowed through the fourteenth amendment to the states and subsequent Supreme Court opinions applied the right to more and more stages of criminal proceedings, it was made clear that the Maryland constitutional right to be allowed counsel, although not considered as aimed to compel the State to provide counsel for an accused, was intended to do away with the common-law rules of England which denied representation by counsel. *Raymond v. State,* 192 Md. 602. And it seemed that the right extended beyond the actual trial. The Court said in *Crooker v. California,* 357 U. S. 433, 439-440: "[S]tate refusal of a request to engage counsel violates due process not only if an accused is deprived of counsel at trial on the merits, * * * but also

---

5. In oral argument before us and in the brief, counsel explained that the judge presiding at the hearing and others in the Municipal Court "let the accused sit in the audience if the lawyer asks it before the Complainant comes in. If there is no lawyer, the police march the man up to the bench to stand next to the Complainant and arresting officer who give evidence."

if he is deprived of counsel for any part of the pretrial proceedings * * *." But prior to *Coleman* it was consistently held that the right to counsel did not accrue at a preliminary hearing and it was not considered a pretrial proceeding within the contemplation of *Crooker*. As it was not such a pretrial proceeding as would entitle an accused to assistance of counsel, the conduct of it before *Coleman* in the absence of even retained counsel would not effect a violation of the constitutional right to counsel or a denial of due process of law more than the taking of a confession without permitting the confessor to consult with his lawyer effected a denial of constitutional rights prior to *Escobedo v. State of Illinois*, 378 U. S. 478, the holding [6] in which also was not retroactively applied. *Johnson v. State of New Jersey*, 384 U. S. 719, 733. Thus the conduct of the hearing here in the absence of Jackson's counsel did not render that proceeding illegal.

The issue was presented within the frame of reference of a possible taint of the judicial identifications of Jackson as the criminal agent. As the absence of counsel *per se* did not render the confrontation at the preliminary hearing illegal, it could not taint the judicial identifications. And we point out that even if the confrontation at the preliminary hearing was illegal, the sanction would not be a dismissal of the indictments, but, if properly raised, the invoking of the exclusionary rules of *United States v. Wade*, 388 U. S. 218 and *Gilbert v. State of California*, 388 U. S. 263, as set out in *Smith and Samuels v. State*, 6 Md. App. 59 at 65. Therefore, the motion to dismiss the indictments was properly denied.

### THE SUFFICIENCY OF THE EVIDENCE

Woodby was the bartender at Jay's Bar when the robbery occurred. "There were four men came in at the same

---

6. "We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." 378 U. S. at 492.

time, and so they sit at the bar for about, oh, 10 or 15 minutes. They drank a draught beer, and then one man comes back, he whips a gun out, he says, 'This is it.' * * * I was close to the register * * *. I reached over with my left hand, and I grabbed the gun barrel." Woodby saw the man's face. He shoved the robber and the robber fell to the floor. He got up "real fast, he comes over the bar, and so we got into a wrestle and we knocked the cash register down. The cash register fell almost on me, on my legs, and then he got the advantage of me, put the gun up to my head, and so I told a friend of mine, Mr. Woosley * * * to give him the money, [in the register] and so he did." Woodby identified Jackson as the robber.

Maynard Woosley's testimony was in substance the same as that of Woodby as to the circumstances of the robbery. But he was unable to identify the robber in court—"My eyes aren't that good."

Tyrone Green was in the bar when the robbery was committed. He made a positive in-court identification of Jackson as the robber. There was no doubt in his mind "as to him being the man." On cross-examination it was elicited that the police showed him pictures of Jackson. On re-direct he said a detective brought five or six photographs to his house the next day. One of them was of Jackson. He picked that out because he recognized Jackson as the robber. No one made any suggestions to him which photograph to select.

Irene Calloway lived about five doors from the bar. She was sitting on her steps and about the time of the robbery she saw a man running from the side door of Jay's Cafe "with his hand down his coat." He was about 12 feet from her. She made a positive judicial identification of Jackson as that man. "I looked at his face right good, real good." There was no doubt in her mind that the man she saw was Jackson.

We have absolutely no difficulty in determining that this evidence was sufficient in law to present the case to the jury. The jury could fairly find beyond a reason-

able doubt from it that Woodby had been robbed and that Jackson was the robber. Weight to be given the identifications was for the jury, *Thompson v. State,* 4 Md. App. 31, and alleged inconsistencies in the testimony of the State's witnesses went to the weight to be given it, *Johnson v. State,* 4 Md. App. 648. See *Williams v. State,* 4 Md. App. 558; *Wilkens v. State,* 5 Md. App. 8; *Barnes v. State,* 5 Md. App. 144. Thus on the evidence admitted the court did not err in denying the motion for judgment of acquittal. *Williams v. State,* 5 Md. App. 450. However, we must next consider the propriety of the admission of the evidence of identification.

After Irene Calloway testified, the State turned to the proof of the offenses charged in indictments 942, 943 and 944 concerning robberies committed about four hours after the robbery of Woodby. After receipt of this evidence defense counsel requested and received permission to approach the bench. Out of the presence of the jury he said:

> "Your Honor, I am going to at this time make a motion that all eye witness identification on the part of all witnesses be excluded from the record on the grounds that it was the result of an illegal, improper confrontation of my client at a preliminary hearing without my presence and without the opportunity for me to cross examine the individuals, and also because it is improper under Wade Vs. United States wherein the improper confrontation was brought out. I would suggest to the Court that the identification of these witnesses is a direct result of improper showing of pictures and photographs, as well as an improper confrontation at a preliminary hearing, and, for that reason, I would move that all of their testimony be excluded from the record."

It is patent that to this point the judicial identifications of Jackson as the robber of Woodby had come into evi-

dence unchallenged. We set out in *Smith and Samuels v. State, supra,* 67-70 the methods of challenging evidence of identification and the procedure to be followed when it is properly challenged. We have applied the rules there enunciated in subsequent cases. In *Jones v. State,* 9 Md. App. 455, certiorari denied, Court of Appeals of Maryland, 6 July 1970, we held flatly that the question of the admissibility of a judicial identification was not before us because it came in without objection made when it was offered, even though a motion to exclude it had been denied at a pretrial hearing. In *Townsend v. State,* 11 Md. App. 487, we applied *Jones* in holding that the admissibility of evidence of identification was not properly before us. At 489. Here the judicial identifications were received in evidence before the jury without objection [7] and the motion to exclude them later made was not timely. In denying the motion "at this time" the court pointed out that there was no evidence before it that any of the witnesses making a judicial identification had confronted or identified Jackson at the preliminary hearing and thus no basis shown for a possible taint of the judicial identifications. Nor was there any showing that a photographic viewing procedure had been illegal. At this point in the proceedings the court permitted testimony to be taken on the matter out of the presence of the jury. Charles Hunt, a victim of one of the robberies of which Jackson was subsequently acquitted, was examined. Then the State examined Detective Carmelo Curreri of the Baltimore City Police Department. As to the Woodby robbery he testified that he showed photographs to Woodby, Woosley, Calloway and Green on 23 February. There were nine photographs, one of which was that of Jackson. He described the procedure he followed. "I take the group of photographs, each [witness] by themselves, and I have the photo-

---

7. We further note that it was the defense who elicited on cross-examination that Green had viewed photographs including one of Jackson. The prosecution made further inquiry regarding this without objection on redirect examination of Green.

graphs with the suspects usually inside the middle of the group, and ask them if they can see anyone in this group of photographs that they recognize or that have done anything to them." He made no suggestion which photographs should be selected. Woodby, Woosley, Calloway and Green each picked out the photograph of Jackson. The court ruled that the photographs were admissible. The evidence of the extra-judicial identifications from the photographs was then adduced before the jury over objection.

On this state of the record there is nothing to show that the photographic viewing procedure, apparently conducted prior to the preliminary hearing, was impermissibly suggestive. Nor is there evidence sufficient to show that Woodby, Green and Calloway, who identified Jackson at the trial, had identified him at the preliminary hearing. But even if they had we think that the court could have properly found that there was clear and convincing evidence that the judicial identification by each witness had an independent source. Therefore, since the photographic viewing procedure did not violate due process of law and could not taint the judicial identifications, and since the judicial identifications had an independent source and so were not tainted by any illegal confrontation at the preliminary hearing in any event, it was not error even had there been timely objection to admit the judicial identifications in evidence.

## THE ISSUE AS TO A MISTRIAL

Woosley, testifying on behalf of the State, in recounting what he observed with respect to the robbery of Woodby was unable to identify the robber in court. But in describing the incident he said the robber came into the bar with two other men. "There were three. One white man, he had his arm in a cast and in a sling, and there was a colored man that set down alongside him. * * * And Mr. Jackson sit down about four seats — — —." Objection was made and sustained. Again he referred to "Mr. Jackson." The Assistant State's Attorney

admonished him: "Now listen, Mr. Woosley. I don't want you to use any names. Did you know any of these men's names at this time." The witness said he did not and the prosecutor said: "Well, don't use any names then, O.K.?" The witness indicated in the affirmative. In response to the next question he said that "Mr. Jackson went to sit — — —." Again he was admonished by the prosecutor and told that if he wanted to refer to the man with the gun to say the man with the gun; "don't use any names." The witness complied for only a short time and again referred to the robber as "Mr. Jackson." Defense counsel simply objected, the objection was sustained and the prosecutor again directed that the name not be used. But later, on cross-examination, the transcript reads:

> "Q. (by defense counsel) Well, what happened then?
> A. The white man and the colored fellow that was setting alongside of him, they left. Then Mr. Jackson, that's when he pulled out this gun and said 'This is it.'
> MR. ANGELETTI (defense counsel): Your Honor, I'm going to ask the Court to instruct the witness not to use any names.
> A. Well —
> THE COURT: All right. You have been asked a few times not to use any names of individuals unless you know who they are. You said you did not know the people who came into the bar, is that correct?
> A. That's correct.
> THE COURT: All right. Just describe the people as the individual with the cast on, or the individual with the gun and so forth. O.K.?
> A. Yes.
> THE COURT: Thank you."

Jackson now claims that the court should have declared

a mistrial. We do not feel that it was error for the court not to have declared a mistrial *sua sponte*. It ruled in favor of Jackson on each objection made by defense counsel and promptly complied with the request to it to caution the witness. No more was asked of it. We observe that since the witness made clear that he could not identify Jackson in court, although he had identified him from photographs, and since Jackson was positively identified in court by three other witnesses, the referring to the defendant by name was in the circumstances harmless error in any event. We see no abuse of judicial discretion compelling reversal.

## THE EVIDENCE OF PRIOR OFFENSES

Jackson elected to testify in his own behalf. To "soften the blow" of evidence of prior convictions which defense counsel thought the State would elicit on cross-examination to impeach Jackson's credibility, he was requested on direct examination: "Tell the Court whether you have been convicted of any crimes, Mr. Jackson." He said that he had and was asked by his counsel: "Would you tell us what you have been convicted of and when." He said he had been convicted of receiving stolen goods in 1959 and served 60 days; in 1961 he was convicted of robbery and sentenced to 4 years; in 1967 he was found guilty of assault and given 60 days. He was asked by his counsel "is that all you were convicted of so far as you can recall?" and replied that in 1968 or 1969 he was arrested "for assault, intent by shooting, found guilty, given a year's suspended sentence, $164.00 court costs." After a question about representation at the trials resulting in the convictions he was asked: "Is that all?" and answered: "All I can think of." On cross-examination the prosecutor reminded the witness that he had testified to some criminal convictions and had said he thought that was all he had. Jackson replied: "I said that was all I could remember." He was then questioned about an assault on Corinthia Jackson with a hammer for which he was fined $5.00 and costs. He denied he was convicted, al-

though admitted to the correctness of data apparently being read from the offense record—his middle name was Kenneth, he was born on 20 May 1942, he lived on East Biddle Street, his father's name was Robert. He denied that he was convicted of larceny on 18 October 1961 and was fined $25 and costs. He admitted that on 25 July 1959 he was convicted of assaulting Leroy Jackson "by cutting him with a bottle" and fined $10. When he was asked if he had been convicted of disorderly conduct on 25 June 1955 and fined $25 objection was made. At the bench defense counsel said he was objecting because the crime did not involve moral turpitude and that the State did not show that Jackson was represented by counsel at the trial resulting in the conviction. The court said it would overrule the objection because the question went to the specific contradiction of direct testimony rather than impeachment of credibility in general. Before the jury Jackson admitted he had been twice convicted of disorderly conduct.

In the light of the evidence of prior convictions brought out on direct examination and the evidence of the prior conviction admitted without objection on cross-examination, we conclude that the challenged evidence did not prejudice Jackson. We are able to say that the admission of the evidence of the convictions of being disorderly, if error, was harmless beyond a reasonable doubt. *Johnson v. State,* 9 Md. App. 436. See *Johnson v. State,* 9 Md. App. 166.

*Judgment affirmed.*